JUDGE TORRES

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. BOVE and JOSEPH J. BOVE, Individually and On Behalf of All Others Similarly Situated, | ) )<br>) )<br>) ) |
| Plaintiffs, | ) )<br>) ) |
| v. | ) )<br>) ) |
| AMARIN CORPORATION, PLC., JOSEPH S. ZAKRZEWSKI, JOHN F. THERO, and STEVEN B. KETCHUM, | ) )<br>) )<br>) ) |
| Defendants. | ) )<br>) ) |

**13 CIV 7882**

<u>**CLASS ACTION**</u>

**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

<u>**DEMAND FOR JURY TRIAL**</u>

*RECEIVED*

*NOV - 5 2013*

*U.S.D.C. S.D. N.Y.*
*CASHIER*

Plaintiffs Joseph A. Bove and Joseph J. Bove ("Plaintiffs"), individually and on behalf of

all other persons similarly situated, by their undersigned attorneys, for their complaint against

defendants, allege the following based upon personal knowledge as to themselves and their own

acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through their attorneys, which included, among other things, a review of the

defendants' public documents, conference calls, and announcements made by defendants, United

States Securities and Exchange Commission ("SEC") filings, wire and press releases published

by and regarding Amarin Corporation, Plc. ("Amarin" or the "Company"), analysts' reports and

advisories about the Company, and information readily obtainable on the Internet. Plaintiffs

believe that substantial evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons

other than defendants who purchased Amarin securities between August 8, 2012 and October 16,

2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the, "Exchange Act").

2.      Amarin is a biopharmaceutical company focused on the commercialization and development of drugs to improve cardiovascular health. Amarin's product development program purports to leverage its extensive experience in lipid science and the potential therapeutic benefits of polyunsaturated fatty acids. Presently, Amarin's lead product is Vascepa® (icosapent ethyl) capsules ("Vascepa"). Vascepa, known in scientific literature as AMR101, is a patented, pure-EPA omega-3 fatty acid prescription product in a 1 gram capsule.

3.      Triglycerides are a type of fat found in the bloodstream that can be used by the body as an energy source. However, high to very high blood levels of triglycerides can negatively impact an individual's health.

4.      Amarin has been studying the efficacy and safety of Vascepa to reduce triglyceride levels in two Phase 3 clinical trials: the MARINE trial, which studied the efficacy of Vascepa in treating patients with very high triglyceride levels ($\geq$500 mg/dL), and the ANCHOR trial, which studied the efficacy of Vascepa in treating patients with high triglyceride levels ($\geq$200 and < 500mg/dL) who were also on statin therapy for elevated cholesterol levels.

5.      The MARINE and ANCHOR trials were both conducted under Special Protocol Assessments with the FDA. A Special Protocol Assessment (SPA) is a written agreement between the FDA and the sponsor of a Phase 3 clinical trial of a drug that the proposed design, clinical endpoints, and statistical analyses of the trial are acceptable to support regulatory approval of the drug upon successful completion of the trial. An SPA is considered binding upon

the FDA unless it is determined that a substantial scientific issue essential to determining the safety or efficacy of the drug has been identified after the testing has begun.

6.      Amarin is also in the process of conducting a cardiovascular outcome trial referred to as the REDUCE-IT study, which seeks to evaluate whether Vascepa reduces cardiovascular risk in patients taking statins for high cholesterol. The REDUCE-IT study is currently projected to be complete in approximately six years and designed to enroll approximately 8,000 patients.

7.      On July 26, 2012, Amarin announced that, based on the outcome of the MARINE trial, the Food & Drug Administration ("FDA") had approved Vascepa as an adjunct to diet to reduce triglyceride (TG) levels in adult patients with hypertriglyceridemia, i.e., very high triglyceride levels ($\geq$500 mg/dL) (the "MARINE Indication"). At the time, Amarin estimated that approximately 4 million people in the United States have hypertriglyceridemia. Vascepa is presently available for sale in the United States by prescription for the MARINE Indication.

8.      On February 26, 2013, based on the outcome of the ANCHOR trial, Amarin announced that it had submitted a Supplemental New Drug Application (sNDA) to the FDA seeking approval for the marketing and sale of Vascepa as an adjunct to diet to reduce triglyceride levels in adult patients with high triglycerides (TG $\geq$200 mg/dL and < 500 mg/dL) with mixed dyslipidemia (the "ANCHOR Indication"). At the time, Amarin estimated that one in five, or nearly 40 million U.S. adults, have triglyceride levels greater than 200 mg/dL. Accordingly, obtaining FDA approval for the sale of Vascepa for the ANCHOR Indication would vastly expand sales of Vascepa.

9.      On June 19, 2013, Amarin announced that it had been informed that the FDA would be convening the Endocrinologic and Metabolic Drugs Advisory Committee ("EMDAC") for

hearings on October 16, 2013 in connection with the FDA's review of the sNDA seeking approval of Vascepa for the ANCHOR Indication.

10.    On October 11, 2013, the FDA released its briefing document (the, "Briefing Document") for the EMDAC meeting scheduled for October 16, 2013. In the Briefing Document, the FDA repeatedly expressed concern that the mineral oil used as a placebo in the ANCHOR trial may not be biologically inert, and therefore may have skewed the trial results by causing the efficacy of Vascepa to be exaggerated. The Briefing Document also highlighted that, since the signing of the SPA covering the ANCHOR trial, several cardiovascular outcome trials had failed to demonstrate meaningful cardiovascular benefit from a reduction in triglyceride levels, thus calling into question whether Vascepa offers any meaningful clinical benefit to patients with high triglyceride levels.

11.    Upon the release of the Briefing Document, the Company's shares declined $1.28 per share, or over 20%, to close at $5.09 per share on October 11, 2013, on volume of over 37.9 million shares.

12.    On October 16, 2013, the Company disclosed that the EMDAC had voted 9 to 2 against approval of Vascepa for the ANCHOR Indication citing, among other things, concerns surrounding the mineral oil placebo and the failure of recent cardiovascular outcome trials to demonstrate meaningful cardiovascular benefit from reduction in triglyceride levels.

13.    On this news, Amarin shares declined $3.16 per share, or over 61%, to close at $2.01 per share on October 17, 2013, on volume of over 105.6 million shares

14.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business in general, and the prospects for FDA approval of Vascepa for the ANCHOR Indication in particular. Specifically, Defendants made false and/or

misleading statements, and/or failed to disclose materials facts, including: (1) the mineral oil used as the placebo in the ANCHOR trial may not have been biologically inert, and therefore may have skewed the results of the trial by exaggerating the efficacy of Vascepa for the ANCHOR Indication; and (2) multiple cardiovascular outcome studies completed after the execution of the SPA covering the ANCHOR trial with the FDA in July 2009 failed to demonstrate that reducing triglyceride levels (whether from intake of omega-3 fatty acids or other compounds) translates into a meaningful cardiovascular benefit.

15.     Defendants' false and misleading statements caused AMRN stock to trade at artificially inflated prices during the Class Period. When the truth was revealed, the price of AMRN stock fell precipitously, causing substantial damage to AMRN shareholders who had purchased the stock at artificially inflated prices.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Amarin's securities are actively traded in this District and many of the acts and practices complained of occurred in substantial part herein.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiffs, as set forth in the accompanying Certification, incorporated by reference herein, purchased Amarin securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant Amarin is a corporation organized under the laws of England and Wales, maintaining its principal place of business at 2 Pembroke House, Upper Pembroke Street 28-32, Dublin, Ireland.   Amarin's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "AMRN."

22.     Defendant Joseph S. Zakrzewski ("Zakrzewski") has served as the Company's Chairman and Chief Executive Officer at all relevant times.

23.     Defendant John F. Thero ("Thero") has served as the Company's President and Principal Financial Officer at all relevant times.

24.     Defendant Steven B. Ketchum ("Ketchum") has served as the Company's Senior Vice President and President of Research and Development at all relevant times.

25.     The defendants referenced above in ¶¶ 22-24 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

26.     Amarin is a publicly traded biopharmaceutical company focused on the commercialization and development of therapeutics to improve cardiovascular health. As noted, Amarin's lead product is Vascepa (f/k/a AMR101), a patented, pure-EPA omega-3 fatty acid prescription product in a 1 gram capsule.

27.    On April 18, 2011, Amarin issued a press release announcing positive, statistically significant top-line results from its ANCHOR trial for Vascepa (f/k/a AMR101). As noted, the purpose of the ANCHOR trial had been to demonstrate that Vascepa is effective for the ANCHOR Indication, i.e., reducing triglyceride levels in adult patients with high triglyceride levels (>200 and <500mg/dL) with mixed dyslipidemia (two or more lipid disorders) on background statin therapy at LDL-C (low-density lipoprotein cholesterol) who were at high risk of cardiovascular disease. As noted, the ANCHOR trial was conducted under an SPA with the FDA, which is deemed binding upon the FDA *unless it is determined that a substantial scientific issue essential to determining the safety or efficacy of the drug has been identified after the testing has begun.*

28.    On July 26, 2012, Amarin issued a press release announcing that the FDA had approved Vascepa for the MARINE Indication, i.e., as an adjunct to diet to reduce triglyceride levels in patients with very high triglyceride levels (>500 mg/dL).

### MATERIALLY FALSE AND MISLEADING
### STATEMENTS MADE DURING THE CLASS PERIOD

29.    On August 8, 2012, Amarin announced financial results for the second quarter ended June 30, 2012. The press release stated in part:

> Consistent with prior guidance, Amarin plans to file a supplemental NDA (sNDA) for the use of Vascepa in the patient population studied in Amarin's ANCHOR Phase 3 trial. Prior to filing this sNDA, the FDA requires that Amarin's cardiovascular outcomes study, REDUCE-IT, be substantially underway. As previously stated, Amarin anticipates this planned sNDA submission to result in a Prescription Drug User Fee Act (PDUFA) action date for the ANCHOR sNDA in the second half of 2013.

30.    In connection with the earnings release, Amarin hosted a conference call to discuss its 2Q 2012 results with analysts and investors. As part of the question-and-answer session on the call, Defendant Zakrzewski participated in the following exchange:

[**Analyst:**] [C]an you give us an idea as to what the overall context is right now as you go through the REDUCE- IT outcome study *of other clinical studies that are outcomes-based looking at the relative benefit of triglyceride lowering, what are those other studies that are currently running and what their relative timing is currently expected to be?* Whatever that is currently in the public domain, relative to REDUCE-IT?

[**Zakrzewski**] Yeah. I'm probably not the right person to comment on other people's studies, nor one or two. But more peripherally than that, again, we feel very good with where we're at with the study, very good with the countries enrolled, the patients enrolled. And it's moving along as we expected, but in terms of other folks, most of what we are tuned into once the data is presented. Like, as we talked about before, aim high in a course, but what's going on simultaneously is a little trickier to figure out.

31.    On November 8, 2012, Amarin announced financial results for the third quarter

ended September 30, 2012. In connection with the earnings release, Amarin hosted a conference

call to discuss its 3Q 2012 results with analysts and investors. As part of his prepared remarks,

Defendant Zakrzewski stated in part:

> Continuing with the regulatory update. We've drafted the sNDA for the ANCHOR indication, that's the use of Vascepa to treat patients on statin therapy with multiple lipid disorders, including triglyceride levels greater than 200 mg/dL. Our submission of this sNDA to FDA is pending only the final REDUCE-IT cardiovascular outcome study being deemed substantially under way as discussed with the FDA in connection with our ANCHOR Special Protocol Assessment. Patient enrollment in the REDUCE-IT study is progressing well and, as previously guided, we anticipate submitting this sNDA submission no later than the end of February 2013, which would position the sNDA for PDUFA date in the fourth quarter of 2013.

32.    Later, as part of the question-and-answer session on the call, Defendant

Zakrzewski participated in the following exchange:

> [**Analyst:**] This is Dewey Steadman for Chris Schott. I just have a quick question on a competitor. *One of your competitors was out this week with data for its Omega-3 product and they commented that Vascepa results may be aided somewhat by the use of mineral oil as a placebo in the MARINE and ANCHOR studies.* And can you just comment on the rationale behind the use of mineral oil instead of olive oil, like the competitor, or corn oil like the studies for Lovaza? *And do you see your placebo choice as a marketing burden heading into the launch*?
>
> [**Zakrzewski**] Dewey, this is Joe. The FDA, through our SPAs, approved our placebo. And over the years, many companies have used olive oil, corn oil, mineral oil, *we really think it's much ado about nothing.* So we really don't see a difference. What I think is

more important to look at, though, is that we've actually looked at the data that was presented on Monday, it was actually worse than the data that our competitor originally presented earlier in the year, i.e., their ANCHOR data was worse than their MARINE equivalent data. What do I mean? On LDL, they increased statistically significant 5% at the 2 gram dose, and at 1% sales and non-inferiority study, this is on their ANCHOR equivalent study. You'll recall, we reduced ours by 6% statistically significance. This is going to be a real problem for them. Again, I'm not the FDA, but I know Reliant has results better than that and failed to get their indication approved. Their non-HDL lowering is 1/3 to 1/2 of what we're doing. They continue to talk about 5% to 7% dropout in their study just due to side effects. Just to remind, you we had 0% in our MARINE study, we had 2% in our ANCHOR study, which was less than placebo. They want to talk about what's going on regarding the side-effect profile. And then they got lower Lp-PLA2 results and actually increase Apo B, whereas we decrease it. I think the challenges are going to be there for them. I really look towards the other competitors that are out there that we'll deal with when we hit the marketplace. They've also got patent challenges. I understand the U.S. PTO has turned one of the patents, or is in the process. And with blanketing patents that we've got, it's going to be hard for them. And then finally on NCE, I hope we get it. I think we deserve it. But their drug, in our opinion, is basically Lovaza. *And -- so really, long answer to your question. I think it's much ado about nothing.* But thank you, Dewey, as always, for your question.

33.    On October 1, 2012, Defendant Zakrzewski sold 150,000 AMRN shares at an average price of $12.56/share, and reaped total proceeds of $1,884,315.

34.    On December 6, 2012, Amarin issued a press release announcing a $100 million non-equity financing with an investment fund managed by Pharmakon Advisors - Biopharma Secured Debt Fund II Holdings Cayman LP (a Cayman Islands exempted limited partnership) ("Biopharma"). To secure its obligations under the financing agreement, Amarin granted Biopharma a security interest in its patents, trademarks, copyrights, know-how and regulatory filings, submissions and approvals related to Vascepa. In the same press release, Amarin announced the hiring of a salesforce consisting of 250-300 experienced drug sales professionals to market Vascepa for the MARINE Indication.

35.    On February 26, 2013, Amarin issued a press release announcing that it had submitted a sNDA to the FDA seeking approval for the marketing and sale of Vascepa for the ANCHOR Indication. The press release quoted Defendant Zakrzewski as stating:

This submission marks another significant milestone achieved for Amarin. Data from our pivotal Phase 3 placebo-controlled ANCHOR study showed that Vascepa is unique in that it significantly lowered both triglycerides and LDL-cholesterol on top of optimized statin therapy and exhibited a safety and tolerability profile similar to placebo, unlike the clinical results of other triglyceride-lowering therapies. The submission of this sNDA for Vascepa follows the FDA approval and recent launch of Vascepa for use as an adjunct to diet to lower triglyceride levels in adult patients with severe (TG $\geq$500 mg/dL) hypertriglyceridemia. If approved for the ANCHOR indication, Vascepa will be the only approved prescription omega 3 therapy for cardiovascular health management in this patient population (TG $\geq$200 mg/dL and < 500 mg/dL with mixed dyslipidemia) and will represent the next generation of lipid management for potentially millions of patients.

36.     On February 28, 2013, Amarin announced financial results for the fourth quarter and full year ended December 31, 2012. In connection with the earnings release, Amarin hosted a conference call to discuss its 4Q and full year 2012 results with analysts and investors. As part of his prepared remarks, Defendant Zakrzewski stated in part:

> Regarding ANCHOR, two days ago we announced that we submitted the sNDA to the FDA seeking approval for market and sell Vascepa for the treatment of patients on statin therapy with multiple lipid disorders, including triglyceride levels of at least 200 mgs per deciliter ANCHOR indication. The indication study in the ANCHOR trial represents significantly larger opportunities in the initial indication for MARINE launched last month as approximately 40 million Americans or one in five adult have triglyceride levels of at least 200 mgs per deciliter. This group of patients represents a broader primary care target market. In addition, as we submitted this, it was under a Special Protocol Assessment agreement with the FDA as was our original MARINE indication.

> The ANCHOR sNDA submission is based on the results of the ANCHOR clinical study in which as previously announced we achieved all the primary and secondary end points, including the reduction of LDL-C by a significant 6.2%. The safety information from the ANCHOR trial were to similar to placebo is already referenced in the existing approved label for Vascepa. In accordance with our Special Protocol Assessment that I mentioned earlier, we announced the sNDA for ANCHOR two days ago, once the REDUCE-IT outcome study was substantially underway.

> ***To remind everyone this was the last requirement under the SPA that needed to be met prior to the approval of the ANCHOR indication, which we expect PDUFA date by the end of 2013.***

37.     On April 19, 2013, Amarin issued a press release announcing that that the FDA had accepted its sNDA seeking approval for the marketing and sale of Vascepa for the

ANCHOR Indication. The release stated that the application had been assigned a Prescription

Drug User Fee Act (PDUFA) date of December 20, 2013. The press release quoted Defendant

Zakrzewski as stating:

> We are very pleased that the FDA has accepted our sNDA submission for the ANCHOR
> indication, which supports the potential expansion of the Vascepa patient population to
> include adult patients on statin therapy with triglyceride levels ranging from 200 to 499
> mg/dL and mixed dyslipidemia. We estimate that one in five, or nearly 40 million, U.S.
> adults have triglyceride levels ranging from 200 to 499 mg/dL. The ANCHOR study
> showed that Vascepa is unique in that it significantly lowered both triglycerides and
> LDL-cholesterol on top of optimized statin therapy and exhibited a safety and tolerability
> profile similar to placebo, unlike the clinical results of other triglyceride-lowering
> therapies. If approved for the ANCHOR indication, Vascepa will be the only approved
> prescription omega 3 therapy for c ardiovascular health management in this patient
> population (TG ≥200 mg/dL and < 500 mg/dL with mixed     dyslipidemia)     and     will
> represent the next generation of lipid management for potentially millions of patients.

38.     On May 9, 2013, the New England Journal of Medicine published the results of

the Italian Risk and Prevention Study, a double-blind, placebo-controlled clinical trial with

12,513 enrolled patients designed to evaluate the beneficial effect of omega-3 polyunsaturated

fatty acids (i.e., fish oil) in patients with multiple cardiovascular risk factors or evidence of heart

disease, but no prior history of heart attacks. Patients were randomly assigned 50/50 to either 1g

daily of fish oil, or the placebo (olive oil). With a median of five years of follow up, 11.7% of the

patients taking 1g daily fish oil, versus 11.9% of the patients taking the placebo, died from

cardiovascular causes or were admitted to the hospital for cardiovascular-related reasons. Based

on these outcomes, the researchers concluded that omega-3 fatty acids did *not* offer a significant

benefit in terms of reducing the risk of death from cardiovascular causes or hospital admission

for cardiovascular causes.

39.     On May 9, 2013, Amarin announced financial results for the first quarter ended

March 31, 2013. In connection with the earnings release, Amarin hosted a conference call to

discuss its 4Q and full year 2012 results with analysts and investors. As part of his prepared remarks, Defendant Zakrzewski stated:

> The FDA has signed a PDUFA date of Saturday December 21, 2013 so our PDUFA date is effectively Friday, December 20. As previously announced in the ANCHOR study, Vascepa demonstrated statistically significant reductions in a broad spectrum of lipid and inflammatory markers on top of optimized statin therapies including significant reductions in LDL-C. As earlier discussed it is important to note that these results are incremental and on-top of the benefit provided by optimized statin therapy alone. The ANCHOR indication upon approval which is the seven short months from now would enable Amarin to market and sell Vascepa for use in adjunctive diet in the treatment of adult patients with high triglyceride that have mixed dyslipidemia, the patient population that has 200 to 499 scripts. Approximately 40 million adult Americans or one in five had triglyceride levels of at least 200. So, it's 10 times more than the patient population in the MARINE. As seen in ANCHOR, a daily Vascepa dose of 4 grams, all the primary and secondary efficacy endpoints of the ANCHOR trial were achieved. In addition, the safety results from the ANCHOR's trial are already included in the current label of Vascepa. As a result of these things, Amarin is optimistic that the FDA will approve Vascepa for this indication.

> Let me also note at this point in time, that no other Omega-3 therapy is approved for the ANCHOR indication. The REDUCE-IT trial has an update through our cardiovascular outcome study that is substantially underway. Our enrollment continues to progress well and we have exceeded well over 4,000 patients and we currently have more than 400 sites in 11 countries enrolling patients in the study and continue acceptance to enroll to its full completion of approximately 8,000. As we previously stated, the results of the study will not be available until specified number of cardiovascular event has been observed, the timing of which is not expected in the near term. ***The current level of enrollment for REDUCE-IT has exceeded the requirement as outlined in our special protocol assessment agreement with the FDA for the ANCHOR indications who have been accepted, which as you know happened last month. This is yet another reason why Amarin is optimistic that the FDA will approve Vascepa from the ANCHOR indications.***

40.     In their closing remarks on the call, Defendants Zakrzewski and Ketchum downplayed the results of the Italian Risk and Prevention Study published in the New England Journal of Medicine, and instead highlighted the JELIS study (conducted in Japan with results reported in 2007) as the appropriate comparison:

> **[Zkrzewski]** I did want to make one other comment that based on a number of call that have gotten today on the New England Journals, medicine article that some of you not may have seen I guess that's call on article it's probably more of a compliment than it

should have but again as we see these things come out we see these as been the wrong drug and a supplement, I think along those lines that the patient protected was neither the marine nor the anchor group totally different, trig lowering people are commenting that they said that they had significant trig lowering results. They lowered trigs 2% to 3% significantly. No data on biomarkers, but you know that the study has been going on since '04 and has several significant challenges to it. *I think it depends on the day for us, it's about JELIS. That's the best comparator for our study, for our drug. And JELIS is the study that in Japan saw a 19% reduction in mortality with our (indiscernible) and when they looked at patients at higher trig levels, they saw 53%. That's the one we should be thinking about, and that supplements not poorly designed old studies.* And I guess the simplest way to put it at the end of the day is that we took that drug that 1 gram drug that by the way was prepared to be half EPA, half EHA, and 20% other stuff, we ran that in the ANCHOR trial or the MARINE trial, it would have failed. So, why would an outcome study, so Steve do you want to say anything, tell us about that study at all that I get it?

**[Ketchum]** No, this has been literally lower dose, different patient population and totally different product with a mixture of Omega-3.

41.     On June 19, 2013, the Company issued a press release announcing that it had been informed that the FDA would be convening the EMDAC on October 16, 2013 in connection with the FDA's review of Vascepa for the ANCHOR Indication. The press release stated in part:

> "ANCHOR clinical trial results demonstrated the important role EPA-only omega-3 can play in helping adult patients with high triglycerides and mixed dyslipidemia," said Christie M. Ballantyne, M.D., Baylor College of Medicine and the Methodist DeBakey Heart and Vascular Center, Houston, Texas, and principal investigator of the ANCHOR trial. "In the ANCHOR trial, Vascepa lowered high triglyceride levels and showed robust reductions in a broad range of other lipid parameters on top of optimized statin therapy compared to placebo. Importantly, these beneficial effects were seen with a safety and tolerability profile comparable to placebo."

> Vascepa was approved in 2012 as an adjunct to diet to reduce triglyceride levels in adult patients with severe ($\geq$500 mg/dL) hypertriglyceridemia, based on the results of Amarin's MARINE clinical trial. The safety data from both the MARINE and ANCHOR clinical trials were reviewed by the FDA as part of the approval of Vascepa in the MARINE indication and are reflected in the approved product labeling for Vascepa. As is customary practice at FDA, yesterday's notification from the FDA is the only communication confirming the need for such a meeting. The FDA advisory committee topics and questions to the committee are anticipated

to be made public by the FDA on its website in the week preceding the meeting, consistent with FDA procedure.

"For key first-in-class indications, an FDA advisory committee meeting is expected, and this public forum will be an important opportunity to discuss the ANCHOR data, which demonstrated Vascepa's unique potential as an adjunct to diet in the treatment of adult patients with high triglycerides (TG 200-499 mg/dL) and mixed dyslipidemia," said Eliot A. Brinton, MD, FAHA, FNLA, Director of Atherometabolic Research, Utah Foundation for Biomedical Research, and President, American Board of Clinical Lipidology. "Currently, many of these patients are receiving another prescription omega-3 which is not indicated for this disorder. Having instead an omega-3 product which lowers LDL-cholesterol in addition to triglycerides, has tolerability comparable to placebo, and is FDA-approved for use on top of statin therapy would be a welcome addition to the physician's armamentarium for comprehensive lipid management."

"With the support of the Amarin team, including our outside consultants, such as Christie and Eliot, we look forward to the advisory panel and working with the FDA to obtain regulatory approval of Vascepa for ANCHOR this year," said Joseph Zakrzewski, Chairman and Chief Executive Officer of Amarin.

42.     On July 12, 2013, the Company completed an offering of 21,700,000 American Depositary Shares at a price of $5.60 per share, resulting in net proceeds to the Company of $121.1 million.

43.     On August 8, 2013, Amarin announced financial results for the second quarter ended June 30, 2013. A press release issued by Amarin in connection with the quarterly report stated in relevant part:

In parallel with marketing Vascepa for the MARINE indication, Amarin is pursuing FDA approval of Vascepa for the ANCHOR indication, a second indication in a significantly larger adult patient population, those with mixed dyslipidemia and TG levels between 200 and 499 mg/dL.

As previously announced, in a clinical trial of the use of Vascepa in the ANCHOR indication, Vascepa demonstrated statistically significant reductions in a broad spectrum of lipid and inflammatory markers, on top of optimized statin therapy, including significant reduction in LDL-C compared to placebo. The FDA has accepted for review Amarin's

14

Supplemental New Drug Application, or sNDA, for the ANCHOR indication and has assigned a PDUFA action date of December 20, 2013 for this sNDA. In addition, the FDA has scheduled a meeting of the Endocrinologic and Metabolic Drugs Advisory Committee (EMDAC) to review the ANCHOR application to be held on October 16, 2013. The safety results from the ANCHOR trial are included in the current label for Vascepa.

The ANCHOR study, which evaluated the efficacy of Vascepa in lowering triglycerides on top of optimized statin therapy for adult mixed dyslipidemia patients with high triglyceride levels (≥200 to < 500 mg/dL), was conducted under a special protocol assessment, or SPA, agreement with the FDA. An SPA is generally considered to be binding upon the FDA except in limited circumstances, such as if the FDA identifies a substantial scientific issue essential to its determining the efficacy or safety of a drug. Amarin has not been informed by FDA of any such essential issue. Amarin believes that it achieved all of the requirements of the SPA agreement. In particular, in the ANCHOR trial, with Vascepa 4 grams per day, all primary and secondary efficacy endpoints were achieved, including a reduction in LDL-C levels compared to placebo. Amarin is optimistic that the FDA will approve Vascepa for this indication and looks forward to the advisory committee meeting as an opportunity to highlight the positive safety and efficacy profile of Vascepa. If approved, Vascepa will be the first drug in its class to be approved for this multi-billion dollar market opportunity. Approximately one in five adults in the United States have triglyceride levels of ≥200 mg/dL.

\*\*\*

During Q2, the FDA accepted Amarin's sNDA for the ANCHOR indication, a precondition for which was that the REDUCE-IT cardiovascular outcomes study be substantially underway. Consistent with Amarin's Special Protocol Assessment (SPA) agreement, and based on the company's discussions with the FDA, the company does not believe the final results of the REDUCE-IT study will be required for FDA approval of Vascepa for the ANCHOR indication, although there can be no assurance that this will be the case. During Q2, the mean and median baseline triglyceride levels for patients participating to date in the REDUCE-IT cardiovascular outcomes study has been confirmed to be > 200 mg/dL. As intended, these are higher baseline TG levels than levels studied in other recent outcomes trials of other lipid modifying therapies. Results of the REDUCE-IT study will not be available until a specified number of cardiovascular events have been observed, the timing of which is not expected in the near-term.

44.    In connection with the earnings release, Amarin hosted a conference call to discuss its 2Q 2013 results with analysts and investors. As part of his prepared remarks, Defendant Ketchum sought to downplay any risk to the approval of Vascepa for the ANCHOR trial indication based on the outcome of recent studies:

> Thank you, Joe. As you know, the FDA assigned Friday December 20th as the PDUFA date for our ANCHOR indication sNDA. In addition as previously announced, the FDA has scheduled on Wednesday October 16th an Advisory Committee meeting pertaining to our sNDA for the ANCHOR indication. We will be well prepared for the Advisory Committee meeting and we remain confident regarding the approval of Vascepa for the ANCHOR indication.
>
> Some investors have asked us why we are having an Advisory Committee Meeting. I remind you that, Amarin had prepared from Advisory Committee Meeting for the MARINE indication, before it was informed that such a meeting would not be conducted. For the MARINE indication, Vascepa was the second drug and its class to be approved, Lovaza being the first and it is understandable why an Advisory Committee Meeting was not held for the severe hypertriglyceridemia indication.
>
> For the ANCHOR indication, we got approval for Vascepa to be the first drug in its class to be approved for an indication in mixed dyslipidemia patients with triglyceride levels greater than reported 200 milligrams per deciliter and less than 500 milligrams per deciliter on top of optimized statin therapy.
>
> Approximately 40 million adult Americans, or one in five, had triglyceride levels of at least 200 milligrams per deciliter. Given the first of a kind approval being sought and the size and scope of this population, it is understandable why the FDA would recommend in AdCom meeting.
>
> Having an AdCom meeting is also consistent with trends that have influenced the FDA to seek greater input and allow greater visibility into its regulatory decision making. Our preparations include obtaining feedback and guidance from leading clinicians in the field and we have already conducted outcomes in an effort to prepare to answer a broad range of questions that could be asked during this meeting.
>
> As is typical, the FDA has not yet informed us of the members of AdCom panel or the questions that they will ask. This has not hindered our ability to prepare. We and our advisors believe that we have appropriate and acceptable responses to a wide range of potential questions. These responses are aided by the favorable efficacy and safety profile of the Vascepa.
>
> In the ANCHOR study, Vascepa demonstrated statistically significant reductions in a broad spectrum of lipid and inflammatory markers on top of optimized statin therapy,

including significant reduction in LDL-C compared to placebo. As a reminder, the ANCHOR study was conducted under Special Protocol Assessment Agreement with the FDA.

This is an extra step that we took with the FDA before commencing the ANCHOR study to ensure that we had a written understanding with the FDA as to what they required for approval of the ANCHOR indication. We believe that we have achieved all that is required. More specifically, we achieved all of the primary and secondary clinical endpoints of the study.

Furthermore, the FDA had the results the results of the ANCHOR study when they reviewed and approved Vascepa for the MARINE indication and the safety profile of Vascepa from the ANCHOR study is reflected in our existing approved label.

We had various discussions with the FDA, leading up to our submission of the sNDA for the ANCHOR indication. Most of these discussions focus on whether or not we were substantially underway with the REDUCE-IT cardiovascular outcomes study.

Through our SPA and related regulatory discussions with the FDA, it was clear that until we were substantially underway with this outcome study, the FDA would not accept the ANCHOR sNDA for review.

For clarity, the SPA and corresponding regulatory discussions in no way require us to have the outcome study completed for the sNDA to be accepted for review or for the ANCHOR indication to be approved. We announced in Q1 that over 4,000 patients were enrolled in the REDUCE-IT study and that we submitted the sNDA for the ANCHOR indication. In Q2, the FDA accepted the sNDA for review.

As is typical, the FDA provided Amarin with a letter that notified us of this acceptance. This Day 74 Letter is in response within 14 days of the initial 60 day review period of the application is commonly used by the agency to preliminarily flag any early and potentially important review issues. The Day 74 Letter for the ANCHOR sNDA included no such surprises. In particular, the letter did not, in any way, suggest that the agency plans to reset its requirements for approval of the ANCHOR indication.

***Some investors have interpreted the AdCom as implying that the agency intends to change the rules for Amarin with respect to the status of the REDUCE-IT outcome study. We have not seen evidence of such a change. We had considerable discussion with the agency over what constituted substantial underway for the outcome study and during these discussions, never did they suggest changing their requirements.***

Rather, we believe that they appreciate the broad undertaking that we are pursuing with REDUCE-IT and the scientific seriousness with which we are conducting the study. At this point, FDA has accepted our sNDA for review, which reflects to us that they agree that the outcome study is substantially underway.

While we believe we do not need the REDUCE-IT study to be completed for approval of the ANCHOR indication, *we do believe that this study is positioned for success. (inaudible) EPA and the JELIS study, albeit in a Japanese population demonstrated significant reduction in cardiovascular events over statin therapy alone.*

*Some investors have argued that because the AIM-HIGH study with Niacin failed, that the FDA will change its view on Vascepa. As a reminder, Niacin is an HPO raising drug not a triglyceride lowering drug and Niacin remains approved on the market. Some also argue the Fenofibrate failed the outcome studies and this will have a bearing on getting the FDA to reassess its requirement for Vascepa. Fenofibrate were not directly studied in a patient population with alleviated triglycerides in an outcome setting. In fact, any accord study of fenofibrates, the subgroup of patients who had alleviated baseline triglycerides showed improved outcomes.*

*This has not been widely publicized because this was not the pre-specified primary endpoint of the study and the study was not powered for this purpose, but it is supportive of the value of lowering triglyceride levels in patients with high triglycerides. In addition, Vascepa not only lowers triglycerides but lowers distraction of other lipid parameters including, compared to placebo, LDL-C, a well established marker of outcomes and Vascepa also lowered various other inflammatory biomarkers. Vascepa does this with a safety profile which is comparable to placebo.*

*Today, patients with alleviated triglycerides are being treated on-label or off-label with a variety of drugs which increase LDL or have various other side effects. We find it difficult to believe that given this environment and the safety and efficacy profile of Vascepa, that Vascepa won't be approved for this expanded indication.*

It is of course important to note that we do not yet know the focus of FDA and the AdCom panel. Our comments today reflect our recent assessment as the issues that will be presented and our view of our planned responses and readiness to address anticipated lines of enquiry. We will continue to assess potential topics and plan accordingly as we continue to prepare for and look forward to the AdCom on October 16.

Switching gears to the REDUCE-IT trial. Enrolment continues to progress in REDUCE-IT at our more than 400 clinical sites in 11 countries around the world. *In addition to the precedent of the JELIS study, the reason to believe in the potential for success of the REDUCE-IT study, we believe that REDUCE-IT subjects will benefit from the following study design aspects.*

The 4 gram per day dosing, which is higher than the approximately 1.8 gram per day JELIS dosing in the Japanese patient population. Also from the REDUCE-IT, median and mean base line triglyceride level in patients participating in the study today, which have greater than the 200 milligram per deciliter, which is higher than studies in recent outcome studies of other lipid modifying therapies and from the added benefits the Vascepa has been shown to provide with respect to anti-inflammatory markers such Lp-PLA2 and hs-CRP.

As we previously stated, the results for the REDUCE-IT study will not be available unit a specified number of cardiovascular events have been observed, the timing of which is not accepted until at least 2016.

On the topic of omega-3 studies, our medical team continues to assess various presentations and news articles on a range of topics, including paper which recently drew negative headlines regarding omega-3.

One such paper correlated high amounts of omega-3 and DHA in particular for patients with prostate cancer. While on the one hand it is convenient for us to be able to say that Vascepa uniquely, does not contain DHA, it is difficult to take that overall paper too seriously as it was not a perspective study, did not have any way of assessing whether or not the prostate cancer patient experiencing increased levels of omega-3s were taking an omega-3 product either dietary, supplemental or prescription, and it is contrary to a series of other studies, which suggested omega-3 to potentially beneficial to such patients.

*Another paper earlier this year summarized med analyses data based on various omega-3 outcomes studies and concluded that omega-3 in low doses don't work. This is part of thesis for Vascepa that low dose omega-3s provide very little benefit. Vascepa delivers more than four times the omega-3 as was reviewed in the majority of the cited studies.*

*It is unfortunate that the authors of that med analysis did not identify that the one study which was successful with the JELIS study of our sister drug Epadel in which highly pure EPA was affected in improving cardiac outcomes on top of statin therapy in Japanese patient population.*

*Overall, we have seen nothing presented anywhere that has diminished our overall confidence in the clinical opportunity provided by Vascepa. Our advisors and thought leaders agree, and urge to be focused on more relevant topics such as reduced LDL particle concentration from Vascepa, the any inflammatory response of Vascepa and incremental efficacy of Vascepa on top of increased potency of statin therapy.*

45.   The statements referenced in ¶¶ 29-45 above were materially false and/or misleading because they misled investors, and/or failed to disclose materials facts, including: (1) the mineral oil used as the placebo in the ANCHOR trial may not have been biologically inert, and therefore may have skewed the results of the trial by exaggerating the efficacy of Vascepa for the ANCHOR Indication; and (2) multiple cardiovascular outcome studies completed after the execution of the SPA covering the ANCHOR trial with the FDA in July 2009 failed to

demonstrate that a reduction in triglyceride levels (whether from intake of omega-3 fatty acids or other compounds) translates into a meaningful cardiovascular benefit, and thus represented precisely the sort of substantial scientific issue essential to determining the efficacy of the Vascepa that would render the SPA nonbinding, and persuade the FDA to deny approval of Vascepa for the ANCHOR Indication.

46.   Defendants' false and misleading statements caused AMRN stock to trade at artificially inflated prices during the Class Period. When the truth was revealed, the price of AMRN stock fell precipitously, causing substantial damage to AMRN shareholders who had purchased the stock at artificially inflated prices.

## THE TRUTH IS REVEALED

47.   On October 11, 2013, the FDA published its Briefing Document for the EMDAC meeting scheduled for October 16, 2013.

48.   In the Briefing Document, the FDA repeatedly expressed concern that the choice of mineral oil as a placebo may have skewed the trial results, and caused the efficacy of Vascepa to be overestimated:

> Notably, despite a lead-in period that is quite typical for trials with lipid parameter endpoints, *within-group changes in lipid parameters and biomarkers of inflammation from baseline to 12 weeks were highly statistically significant in the mineral oil placebo group (all $p<0.001$)*. Although it is recognized that the effect of an intervention (e.g., mineral oil capsules) cannot be isolated when one only considers within-group changes over time, *these results at least suggest the possibility that mineral oil may not be biologically inert*. If true, this complicates the interpretation of between-group differences. For example, LDL-C increased a median 9% in the placebo group, despite statin therapy, and only increased a median of 1.5% in the AMR101 4g group (Figure 1), *but does this reflect an LDL-lowering effect of AMR101, an LDL-raising effect of mineral oil in statin-treated individuals, or some combination?*
>
> * * *
>
> [T]he magnitude of the changes in several lipid and lipoprotein parameters, as well as biomarkers of inflammation, between baseline and Week 12 in the placebo group are rather atypical for lipid-lowering trials. These trials, including ANCHOR, often include a

several-week lead-in period to stabilize diet and concomitant lipid-altering medications well before baseline measurements. Although even highly statistically significant within-group changes can certainly result from factors other than the intended experimental intervention, *one concerning possibility is that the mineral oil placebo may not be biologically inert. If this were true, the estimated treatment effects may be biased*.

\* \* \*

The changes in lipid and lipoprotein parameters from baseline to Week 12 in the mineral oil placebo group are rather atypical for a trial that included a stabilization period for diet and lipid-lowering therapy, raising the possibility that mineral oil may not be as inert as assumed. *If true, the treatment effects observed with AMR101 may be overestimated.*

\* \* \*

[A]s depicted in Figure 11 below, there were marked median % increases from baseline in the placebo group across all the lipids and lipoproteins evaluated here, resulting in larger treatment differences between the VASCEPA and placebo groups. *This reviewer could not find any statistical reasoning to explain this perplexing phenomenon of placebo.* Information was not provided on the compliance of the background statin therapy during the double-blind treatment period. It is also not known whether mineral oil interferes with absorption of statins . . . In conclusion . . . The observed beneficial treatment effects of VASCEPA relative to placebo may be over-estimated.

49.     Additionally, concerning the current scientific knowledge with respect to the cardiovascular benefit of reduced triglyceride levels, whether achieved via omega-3 fatty acids or some other compound, the Briefing Document observed:

Several cardiovascular outcome trials of non-statin lipid-modulating therapy, such as those referenced by the Division in 2008, have since completed. ACCORD-Lipid, AIM-HIGH, and HPS2-THRIVE, which were designed to target residual cardiovascular risk by improving lipid parameters other than LDL-C (e.g., HDL-C and/or TG) in patients optimally treated with statin therapy, *failed to demonstrate unequivocally additional cardiovascular benefit from non-statin lipid-modulating drugs*. Several hypotheses could be put forward regarding the failures of these large, carefully designed trials to demonstrate benefit on their primary endpoints, *but the evidence to date certainly challenges the hypothesis that adding lipid-modulating therapies to patients optimally treated with statins will reduce residual cardiovascular risk*. Although it can be argued that lipid and/or lipoprotein parameters can be used to define subpopulations of statin-treated patients who would be expected to benefit from various non-statin lipid-modulating agents, contemporary trials have not yet prospectively tested this hypothesis. *Members of the Endocrinologic and Metabolic Drugs Advisory Committee (EMDAC) are asked to consider the results of the ANCHOR trial in the context of the available science when recommending whether to approve the proposed treatment indication for 4 grams AMR101 daily to be co-administered with statin therapy for the treatment of*

*patients with mixed dyslipidemia and coronary heart disease (CHD) or its risk equivalent.*

50.    The Briefing Document further noted obviously significant differences between the design of the ANCHOR trial and the JELIS Study that rendered a comparison between JELIS and ANCHOR inappropriate (contrary to the representations of Amarin management on prior conference calls). Most critically, as opposed to the ANCHOR trial, which was double-blind (i.e., neither participants nor researchers were aware of what treatment each participant was receiving), the JELIS Study was open-label (i.e., both the researchers and participants knew which treatment was being administered to each participant). As the Briefing Document explained, "the open-label study designs of GISSI-P and JELIS . . . may have introduced bias in patient/physician behavior that could have confounded the treatment effect, particularly in physician-directed outcomes such as hospitalization and interventional procedures." The Briefing Document also noted that, whereas over 90% of the patients in the ANCHOR trial were on medium to high doses of statins (a class of drugs used to lower cholesterol levels), all of the patients in the JELIS study were on low doses of statin by design.

51.    Following the release of the Briefing Document, the Company's shares declined $1.28 per share or over 20% to close at $5.09 per share on October 11, 2013, on volume of over 37.9 million shares.

52.    On October 16, 2013, the Company disclosed that the EMDAC voted 9 to 2 against approval of Vascepa for the ANCHOR Indication. Analysts and investors following the EMDAC meeting on the FDA's real-time audio feed indicated that the following concerns, among others, contributed towards the negative vote: (i) that the mineral placebo may not have been inert, which may have led to an overstatement of the benefits of Vascepa; (ii) the failure of recent cardiovascular outcome trials to demonstrate a reduction in cardiovascular risk from lower

triglyceride levels, whether achieved via fish oil therapy or some other compound; (iii) the inapplicability of the results in the JELIS Study to EMDAC's determination due to differences in trial design (i.e., open-label, low statin).

53.     Following the 9-2 vote at the EMDAC meeting, Amarin shares declined $3.16 per share or over 61%, to close at $2.01 per share on October 17, 2013, on volume of over 105.6 million shares.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

54.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Amarin securities during the Class Period (the "Class"); and were damaged thereby.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Amarin securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Amarin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by defendants' acts as alleged herein;

•       whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Amarin;

•       whether the Individual Defendants caused Amarin to issue false and misleading financial statements during the Class Period;

•       whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

•       whether the prices of Amarin securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

•       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

60.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

•       defendants made public misrepresentations or failed to disclose material facts during the Class Period;

•       the omissions and misrepresentations were material;

•       Amarin securities are traded in efficient markets;

•       the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

•       the Company traded on the NASDAQ, and was covered by multiple analysts;

•       the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

•       Plaintiffs and members of the Class purchased and/or sold Amarin securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

62.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amarin securities; and (iii) cause Plaintiffs and other members of the Class to purchase Amarin securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Amarin securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Amarin's finances and business prospects.

66.     By virtue of their positions at Amarin, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Amarin, the Individual Defendants had knowledge of the details of Amarin's internal affairs.

68.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Amarin.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Amarin's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Amarin securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Amarin's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased Amarin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

69.     During the Class Period, Amarin securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Amarin securities

at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Amarin securities were substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Amarin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

70.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false financial statements to the investing public related to its prospects for FDA approval.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

72.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of Amarin, and conducted and participated, directly and indirectly, in the conduct of Amarin's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Amarin..

28

74.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Amarin's financial condition and results of operations, and to correct promptly any public statements issued by Amarin which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Amarin disseminated in the marketplace during the Class Period concerning Amarin's financial prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Amarin to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Amarin within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Amarin securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Amarin.  By reason of their senior management positions and/or being directors of Amarin, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Amarin to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Amarin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Amarin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and,

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 5, 2013

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP

Jeremy A. Lieberman
Lesley F. Portnoy
Fei Lu Qian
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.ocm
flqian@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
pdahlstrom@pomlaw.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
jfruchter@wohlfruchter.com

*Counsel for Plaintiffs*

**CERTIFICATION OF JOSEPH A. BOVE PURSUANT TO**
**THE PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Joseph A. Bove, hereby declare as follows:

1. I have reviewed the facts and allegations in a complaint against Amarin Corporation plc ("AMRN") and related parties, and authorize its filing.

2. I did not purchase AMRN securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The attached Schedule A lists all of my purchases and sales in AMRN securities during the class period set forth in the complaint.

5. During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

   I declare under penalty of perjury that the foregoing is true and correct.

   Executed on this 24th of October 2013.

                                              Joseph A. Bove
                                              Joseph A. Bove

## CERTIFICATION OF JOSEPH J. BOVE PURSUANT TO
## THE PRIVATE SECURITIES LITIGATION REFORM ACT

I, Joseph J. Bove, hereby declare as follows:

1. I have reviewed the facts and allegations in a complaint against Amarin Corporation plc ("AMRN") and related parties, and authorize its filing.

2. I did not purchase AMRN securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The attached Schedule A lists all of my purchases and sales in AMRN securities during the class period set forth in the complaint.

5. During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th of October 2013.

Joseph J. Bove